**FEDERAL INSURANCE CO., Plaintiff,**

**v.**

**The UNITED STATES, Defendant.**

**No. 6–88C.**

United States Court of Federal Claims.

Sept. 27, 1993.

Marshall T. Hunt and Michael M. Bergfeld, Los Angeles, CA, for plaintiff.

Genevieve Holm, with whom were Asst. Atty. Gen. Stuart M. Gerson, David M. Cohen, Director, and Thomas W. Petersen, Asst. Director, Washington, DC, for defendant. Karren Dickson, U.S. Postal Service, of counsel.

## OPINION

ANDEWELT, Judge.

In this government contract action, plaintiff, Federal Insurance Co., seeks to recover from the United States Postal Service (Postal Service) payments it made to Postal Service employees in its capacity as liability insurer for Bonus–Bilt, Inc. (Bonus–Bilt), a federal contractor. Plaintiff contends that it was obliged to make these payments because the Postal Service breached certain implied obligations undertaken in the Postal Service's contract with Bonus–Bilt. This action is presently before the court on defendant's motion to dismiss the complaint pursuant to RCFC 12(b)(1) for lack of subject matter jurisdiction.[1] Defendant contends, *inter alia*, that it was not in privity of contract with plaintiff and that plaintiff, therefore, lacks standing to bring suit in this court. Defendant is correct. For the reasons set forth below, the United States

---

**1.** In the alternative, defendant seeks summary judgment on the merits of plaintiff's claim. Because the court ultimately concludes that it lacks jurisdiction over the instant action, the court will not address the merits of plaintiff's claim.

has not waived sovereign immunity so as to authorize plaintiff, the general liability insurer for a federal contractor, to bring suit in its own name against defendant on a claim arising under a government contract. Hence, defendant's motion to dismiss is granted.

## I.

For the purpose of resolving defendant's motion to dismiss, the court will assume the allegations in the complaint are true. During the mid–1970s, the Postal Service solicited bids for the design of a general purpose mail container for use by Postal Service employees. In response to this solicitation, Bonus–Bilt submitted a design concept which the Postal Service ultimately accepted. Thereafter, the Postal Service decided to solicit bids from other companies for the manufacture of mail containers. The design specifications the Postal Service issued for this solicitation included features employed in Bonus–Bilt's design and on which Bonus–Bilt had secured patent coverage. After Bonus–Bilt made the Postal Service aware of its patent, Bonus–Bilt and the Postal Service entered a patent license agreement on April 4, 1977. The Postal Service agreed therein to pay Bonus–Bilt a fixed royalty on any mail container the Postal Service purchased from a manufacturer other than Bonus–Bilt that utilized Bonus–Bilt's patented features. Ultimately, the Postal Service awarded contracts for the manufacture of mail containers to Bonus–Bilt and several other companies.

Subsequently, three Postal Service employees brought tort actions against Bonus–Bilt for injuries they incurred while working with mail containers produced under these contracts by manufacturers other than Bonus–Bilt. Plaintiff, as liability insurer for Bonus–Bilt, paid approximately $2.4 million to these employees, either pursuant to judgment or settlement. Plaintiff brought the instant action to recover these payments.

## II.

Plaintiff claims that defendant is liable for the $2.4 million plaintiff paid to the injured Postal Service employees because plaintiff's obligation to make these payments resulted from defendant's breach of certain contractual obligations owed to Bonus–Bilt pursuant to the April 4, 1977, license agreement.[2] *Inter alia,* plaintiff contends that defendant breached the license agreement (1) by failing to inspect, maintain, and repair the mail containers so as to assure that the containers met appropriate operational and safety standards, and (2) by failing to require all manufacturers to use nameplates to identify the mail containers they manufactured.[3] Thus, plaintiff does not seek to enforce any contract, express or implied, between plaintiff and defendant, but rather seeks to enforce Bonus–Bilt's rights under the patent license agreement. Plaintiff contends that it is entitled to enforce Bonus–Bilt's contractual rights because plaintiff's insurance contract with Bonus–Bilt contains a subrogation provision which provides that if plaintiff makes a liability payment thereunder, plaintiff "shall be subrogated to all [Bonus–Bilt's] rights of recovery against any person or organization."

## III.

It is a fundamental legal tenet that the United States, as sovereign, is immune from suit except to the extent it consents to be sued. *United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 1352, 63 L.Ed.2d 607 (1980); *United States v. Testan,* 424 U.S. 392, 399, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976). "A waiver of sovereign immunity 'cannot be implied but must

2. Plaintiff was not obliged under the Contract Disputes Act (CDA), 41 U.S.C. §§ 601–613, to present its claim to the contracting officer before instituting this action because Bonus–Bilt and the Postal Service entered their license agreement prior to the CDA's effective date of November 1, 1978. *See* 41 U.S.C. § 601 comment.

3. Apparently, plaintiff alleges that it would not have been required to pay the injured employees had the employees known that Bonus–Bilt did not manufacture the faulty mail containers.

be unequivocally expressed.' " *Mitchell*, 445 U.S. at 538, 100 S.Ct. at 1351 (quoting *United States v. King*, 395 U.S. 1, 4, 89 S.Ct. 1501, 1502, 23 L.Ed.2d 52 (1969)). The Tucker Act grants the Court of Federal Claims jurisdiction over "any claim against the United States founded ... upon ... any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). The Tucker Act does not specify who may pursue such a claim, *i.e.*, it does not specify whether Congress authorizes any party other than a party to a "contract with the United States" to bring suit against the United States.

The Court of Appeals for the Federal Circuit and its predecessor, the Court of Claims, addressed the scope of the Tucker Act's waiver of sovereign immunity in a series of actions brought against the United States by subcontractors and materialmen on government contracts. In these cases, the subcontractors and/or materialmen sought to bring suit in their own names to pursue claims that the government had failed to make payments for work performed and materials utilized under government contracts. The courts rejected these claims and interpreted the Tucker Act as authorizing suit only where privity of contract exists between the party bringing suit and the United States, *i.e.*, only where the claim is founded upon an express or implied contract between the parties. *See, e.g., Erickson Air Crane Co. v. United States*, 731 F.2d 810, 813 (Fed. Cir.1984) ("The government consents to be sued only by those with whom it has privity of contract, which it does not have with subcontractors."); *United States v. Johnson Controls, Inc.*, 713 F.2d 1541 (Fed.Cir. 1983); *United Electric Corp. v. United States*, 227 Ct.Cl. 236, 647 F.2d 1082 (1981), *cert. denied*, 454 U.S. 863, 102 S.Ct. 322, 70 L.Ed.2d 163 (1981).

Plaintiff is not a party to the license agreement between the Postal Service and Bonus–Bilt and, hence, is not in privity of contract with defendant. Plaintiff contends, however, that it nevertheless is entitled to maintain the instant action in its own name because of the subrogation provision contained in plaintiff's insurance agreement with Bonus–Bilt. Plaintiff argues that the principle of equitable subrogation permits it to step into the shoes of Bonus–Bilt and pursue in its own name those claims Bonus–Bilt could have brought directly against the Postal Service. In effect, plaintiff interprets the Tucker Act as authorizing a federal contractor, through a unilateral contract action with a third-party liability insurer, to extend to that insurer the right, in certain circumstances, to sue the government on the underlying federal contract.

Plaintiff cites no case in which a court has interpreted the Tucker Act's jurisdictional grant so broadly, *i.e.*, where a federal contractor's liability insurer is permitted to bring suit in its own name on the insuree's government contract. Plaintiff does cite, however, a series of cases brought under the Tucker Act in which courts have allowed a surety, who initially issued performance and/or payment bonds guaranteeing completion of a government contract and who subsequently undertook contract performance, to bring suit in its own name to secure funds due under the contract. *E.g., Balboa Ins. Co. v. United States*, 775 F.2d 1158 (Fed.Cir.1985); *United Electric Corp. v. United States*, 227 Ct.Cl. 236, 647 F.2d 1082, *cert. denied*, 454 U.S. 863, 102 S.Ct. 322, 70 L.Ed.2d 163 (1981). But these cases do not stand for the proposition that in enacting the Tucker Act, Congress intended the concept of equitable subrogation to be applied broadly in Tucker Act contract cases. To the contrary, the rationale for finding a waiver of sovereign immunity for government contract sureties in such cases appears narrow in scope and would not apply to a general liability insurer like plaintiff. In *Balboa*, the Court of Appeals for the Federal Circuit explained the distinction between a subcontractor, who cannot bring suit in its own name, and a surety, who in certain cases can, by focusing on mutual obligations resulting from a surety arrangement. The Federal Circuit reasoned, as follows:

> Decisions of our predecessor court and the Supreme Court make clear that a

surety is *not* in the same position as that of a subcontractor or materialman. *E.g., United Electric Corp. v. United States,* 227 Ct.Cl. 236, 647 F.2d 1082, 1086, *cert. denied,* 454 U.S. 863, 102 S.Ct. 322, 70 L.Ed.2d 163 (1981). A suretyship is the result of a three-party agreement, whereby one party (the surety) becomes liable for the principal's or obligor's debt or duty to the third party obligee, *see United States v. United States Fidelity & Guaranty Co.,* 236 U.S. 512, 35 S.Ct. 298, 59 L.Ed. 696 (1915). Both the obligor-principal (the prime contractor) and the surety are liable to the obligee (here, the Government), and no suretyship *exists* in the absence of any of the three parties. In contrast to a subcontractor, which has no obligations running directly to or from the Government, *United States v. Munsey Trust Co. of Washington, D.C.,* 332 U.S. 234, 241, 67 S.Ct. 1599, 1602, 91 L.Ed. 2022 (1947) (and therefore possesses no enforceable rights against the United States), a surety, as bondholder, is as much a party to the Government contract as the contractor. If the *surety* fails to perform, the Government can sue it on the bonds. *E.g., Carchia v. United States,* 202 Ct. Cl. 723, 485 F.2d 622 (1973).

*Balboa,* 775 F.2d at 1160 (emphasis in original).

A general liability insurer such as plaintiff is by no stretch of the imagination "as much a party to the Government contract as the contractor." A general liability insurance contract does not result in a "three-party agreement" analogous to a surety arrangement. For example, plaintiff's insurance agreement with Bonus–Bilt creates rights and obligations that run ex-clusively between Bonus–Bilt, the contractor, and plaintiff, the insurer. The Postal Service is not a party to that insurance agreement and the agreement does not create any obligations that run directly between the Postal Service and plaintiff. If Bonus–Bilt failed to perform the contract work, the Postal Service could not look to plaintiff to complete the work, *i.e.,* the insurance agreement does not render plaintiff "liable for [Bonus–Bilt's] debt or duty [to the Postal Service]."

A surety arrangement is a unique and distinct type of arrangement. Under the Miller Act, 40 U.S.C. § 270a, before the government can award a public building or public work contract exceeding $25,000, the contractor must provide a performance bond from a surety.[4] The Miller Act specifies that this bond is "for the protection of the United States." By agreeing through a performance bond to assume all of the contractor's burdens and obligations for contract performance, a surety, in a sense, is the alter ego of the contractor from the government's perspective. A surety not only steps into, but also completely fills, the shoes of the contractor.[5]

The same cannot be said for a general liability insurer such as plaintiff. The subrogation provision in plaintiff's insurance contract with Bonus–Bilt is narrow in scope and does not purport to place plaintiff in Bonus–Bilt's shoes with respect to Bonus–Bilt's obligations to the Postal Service. Rather, the only pertinent right vis-a-vis the government purported to be transferred to plaintiff in the insurance agreement is Bonus–Bilt's right to sue the government, and that right attaches only when plaintiff pays liability incurred by Bonus–Bilt. Thus, in essence, the subrogation

---

**4.** In addition, the Miller Act provides that the contractor must also furnish a payment bond from a surety sufficient to protect all persons supplying labor and material for work performed under the contract. 40 U.S.C. § 270a(a)(2).

**5.** The Court of Claims once described the relationship between the government and a surety as follows:

[A] surety for the performance of any obligation to the United States stands in direct contract relation with the United States, and, as he is liable to be sued by the United States upon any default by his principal, so, on the other hand, has he a right to sue the United States wherever a balance is due from the Government to which he is, upon the equitable principle of subrogation, ultimately entitled.

*Shwarz v. United States,* 35 Ct.Cl. 303, 309, 1900 WL 1454 (1900).

provision amounts to no more than a contingent assignment of a right to sue the government.

In this context, plaintiff's analogy to surety cases must fail. The *Balboa* court's interpretation that the Tucker Act authorizes suit by a person who is "as much a party to the Government contract as the contractor" would hardly demand the conclusion that Congress also intended to authorize suit by parties who have no direct responsibility for contract performance and no other obligation owed directly to the government. Plaintiff's relationship to the government seems far better analogized to that of a subcontractor, which the *Balboa* court reasoned "has no obligation[ ] running directly to or from the Government ... and therefore possesses no enforceable rights against the United States."

### IV.

To support the proposition that the doctrine of equitable subrogation applies broadly against the government, plaintiff also cites a series of nonsurety cases brought under statutes other than the Tucker Act. None of these cases, however, stands for such a sweeping proposition. In *United States v. Aetna Casualty & Surety Co.*, 338 U.S. 366, 70 S.Ct. 207, 94 L.Ed. 171 (1949), the Supreme Court permitted an insurer subrogee to bring suit in its own name against the United States for a claim available to the insured under the Federal Tort Claims Act (FTCA). The Supreme Court, however, based its decision on the FTCA's language indicating that Congress intended the government to be liable for FTCA claims to the same extent as a "private person."[6] The Tucker Act contains no similar language expressing Congress' intent to waive sovereign immunity such that the government can be sued to the same extent as a "private person." In *Aetna Ins. Co. v. United States*, 142 Ct.Cl. 771, *reh'g denied*, 142 Ct.Cl. 790 (1958), the Court of Claims allowed a railroad-carrier, under a subrogation theory, to bring a tax refund suit on excise taxes that had been paid by a manufacturer of alcohol. But again, the court found a basis for suit in the wording of the pertinent statute which broadly permitted recovery of excise taxes by "the person claiming same" and did not limit recovery exclusively to the taxpayer.

In *Quarles Petroleum Co. v. United States*, 213 Ct.Cl. 15, 551 F.2d 1201 (1977), the plaintiffs brought suit in the Court of Claims pursuant to jurisdiction set forth in the Federal Water Pollution Control Act (FWPCA), 33 U.S.C. § 1321(i)(1).[7] The FWPCA permits, under specified circumstances, the owner of a vessel from which oil has been discharged to recover from the United States the reasonable "costs incurred" in cleaning up the oil spill. The plaintiffs in *Quarles* suffered such a discharge and orchestrated the effort to clean up the oil. The clean-up costs for the oil spill were paid by the plaintiffs' insurer.[8] Thereafter, the plaintiffs brought suit under the FWPCA for the benefit of their insurer to recover these payments. The government contended that the plaintiffs

---

**6.** The court quoted the relevant language of the FTCA discussing the government's liability as if a "private person" as follows:

[T]he United States district court for the district wherein the plaintiff is resident or wherein the act or omission complained of occurred, ... sitting without a jury, shall have exclusive jurisdiction to hear, determine, and render judgment on any claim against the United States, for money only, ... on account of damage to or loss of property or on account of personal injury or death caused by the negligent or wrongful act or omission of any employee of the government, while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant for such damage, loss, injury, or death in accordance with the law of the place where the act or omission occurred. Subject to the provisions of this chapter, the United States should be liable in respect of such claims to the same claimants, in the same manner, and to the same extent as a private individual under like circumstances....

*United States v. Aetna*, 338 U.S. at 369–70, 70 S.Ct. at 210.

**7.** The Federal Water Pollution Control Act was substantially amended in 1990 by Pub.L. No. 101–380, 104 Stat. 484 (codified as amended at 33 U.S.C. §§ 2701–2761 (1990)).

**8.** The plaintiffs were under common ownership and had the same insurer.

could not recover such payments because the clean-up costs were paid by their insurer, a subrogee of the plaintiffs via the insurance agreement, rather than by the plaintiffs. *Quarles*, 213 Ct.Cl. at 20. The court rejected this contention and concluded that the plaintiffs had satisfied the FWPCA's requirements for initiating suit against the government. The court stated:

> Section 1321(i)(1) speaks in terms of the owner-operator recovering from the United States "the reasonable costs *incurred* in such removal." To incur means to be liable for or subject to; it does not mean to actually pay for. The facts in this case clearly demonstrate that the plaintiffs ... were liable for the costs resulting from the clean up operation.... The fact that the plaintiffs were insured and that the plaintiff's insurer paid out the total cost of the clean up operations is immaterial under Section 1321.

*Id.* at 22 (emphasis added) (footnote omitted).

The court recognized that waivers of sovereign immunity must be strictly construed, but found in the language of Section 1321(i)(1) a clear waiver authorizing the plaintiffs to bring suit and "[n]o intimation" that the plaintiffs could not bring suit "for and on behalf of a subrogee." *Id.* at 23. The court further noted that a contrary conclusion would hamper Congress' overall concern to reduce water pollution as much as possible throughout the United States.

Herein, there is no analogous clear waiver of sovereign immunity in the Tucker Act to authorize suit by plaintiff, a liability insurer for a federal contractor. Moreover, plaintiff has not contended that interpreting the Tucker Act so as to preclude such a suit would significantly hamper the congressional concerns that led to the Tucker Act's adoption.[9]

### V.

Next, plaintiff alleges that there are strong equitable factors that justify a broad application of equitable subrogation in Tucker Act cases. There are two responses to plaintiff's equitable plea. First, and more fundamentally, the legal issue herein is whether this court has jurisdiction to entertain plaintiff's claim. Congress holds the exclusive authority to establish the metes and bounds of this court's jurisdiction and this court lacks authority to expand Congress' jurisdictional grant regardless of the equities. *Keene Corp. v. United States*, — U.S. —, —, 113 S.Ct. 2035, 2040, 124 L.Ed.2d 118 (1993) ("Congress has the constitutional authority to define the jurisdiction of the lower federal courts, and, once the lines are drawn, 'limits upon federal jurisdiction ... must be neither disregarded nor evaded'" (citations omitted) (quoting *Owen Equipment & Erection Co. v. Kroger*, 437 U.S. 365, 374, 98 S.Ct. 2396, 2403, 57 L.Ed.2d 274 (1978))); *United States v. Sherwood*, 312 U.S. 584, 587–88, 61 S.Ct. 767, 770–71, 85 L.Ed. 1058 (1941). The Supreme Court has defined the ground rules for interpreting congressional grants of jurisdiction and, as explained above, the Supreme Court has concluded that sovereign immunity cannot be waived unless Congress unequivocally expresses such an intent. *Mitchell*, 445 U.S. at 538, 100 S.Ct. at 1352. In decisions cited above, courts have concluded that contract actions brought directly by subcontractors and/or materialmen of government contractors are not suits "founded ... upon any ... contract with the United States." If the words of the Tucker Act do not reach such plaintiffs, it would not seem possible to find in these same words an unequivocal expression of congressional intent to waive

---

**9.** Plaintiff appears to rely upon a discussion in *Quarles* of case precedent dealing with subrogation under other statutes. But the *Quarles* court never stated that based on that precedent, it would have allowed the insurer subrogee to bring suit in its own name. Moreover, as was true with the cases mentioned above, the statutes discussed by the *Quarles* court, while not specifically mentioning subrogation, were sufficiently broad in their authorization language to encompass suit by a subrogee in its own name. Herein, as described above, the Tucker Act has not been interpreted so broadly and the courts have required either privity of contract or a plaintiff who is "as much a party to the Government contract as the contractor."

sovereign immunity so as to allow a federal contractor's general liability insurer to bring a contract suit in its own name against the government.

Second, the equities are not nearly as one sided as plaintiff suggests. Plaintiff is not without fault for its current predicament. Plaintiff apparently could have avoided any jurisdictional dispute had it modified the terms of its insurance policy with Bonus–Bilt, *e.g.,* plaintiff could have refused to extend liability insurance unless Bonus–Bilt agreed either to bring suit in its own name for the benefit of plaintiff or to in some way authorize plaintiff to bring suit in Bonus–Bilt's name. *See North Slope Technical, Ltd. v. United States,* 27 Fed.Cl. 425 (1992). Plaintiff, however, chose to enter the insurance agreement without such protection.

Moreover, viewing the situation from defendant's perspective, allowing the liability insurer of a federal contractor to bring suit in its own name without the contractor participating as a party could present a variety of potential risks and increased costs. For example, a risk of multiple suits would exist in that a contractor and its liability insurer potentially could subject the government to separate suits at different times for the same government contract breach—the contractor could seek to recover "out-of-pocket" expenditures, and the insurer could seek to recover payments made in its capacity as an insurer. Next, the contractor's nonparty status potentially could disadvantage the government in defending the action. For example, there are more discovery tools available and discovery can be accomplished more efficiently with respect to a party as compared to a nonparty. *See, e.g.,* RCFC 33 and 36. Herein, securing discovery from Bonus–Bilt could be crucial in that to the extent ambiguity exists in the license agreement between the Postal Service and Bonus–Bilt, a determination of defendant's liability could depend upon the details of Bonus–Bilt's contract negotiations with the Postal Service. Furthermore, in a suit by a federal contractor's liability insurer, the government could be forced to address collateral factual and legal issues that it would not address in a suit brought by the government contractor, including the issue of whether the insurance contract granting the insurer subrogation rights was valid and binding.

Pointing out the potential disadvantages to the government that would result if liability insurers were permitted to bring suit in their own names under the Tucker Act is not to say that Congress could not reasonably conclude that allowing such suits in certain circumstances would be appropriate. It is to say, however, that there are significant benefits to the government from requiring that any suit on an underlying contract be brought in the name of the federal contractor. Absent a clearer indication in the wording of the Tucker Act, this court cannot conclude that Congress intended to forego those benefits by waiving sovereign immunity under the Tucker Act so as to allow the instant suit.

### Conclusion

For the reasons set forth above, defendant's motion to dismiss is granted and the Clerk of the Court is directed to enter judgment dismissing plaintiff's complaint. No costs.

IT IS SO ORDERED.