FIRST HARTFORD CORPORATION PENSION PLAN & TRUST, on behalf of itself, Dollar Dry Dock Bank of New York, and all other similarly situated shareholders of Dollar Dry Dock Bank of New York

v.

The UNITED STATES.

No. 96–801C.

United States Court of Federal Claims.

Nov. 20, 1998.

600

Thomas M. Buchanan, Washington, D.C., attorney of record for the plaintiff.

Shalom Brilliant, Washington, D.C., with whom was Assistant Attorney General Frank W. Hunger, for the defendant. Thomas A. Schulz and Thomas L. Holzman, Federal Deposit Insurance Corporation, of counsel.

## OPINION

YOCK, Judge.

This contract action comes before the Court on the defendant's Motion to Dismiss the plaintiff's Complaint. The plaintiff, First

Hartford Corporation Pension Plan & Trust ("First Hartford"), a shareholder of Dollar Dry Dock Bank of New York ("Dollar Dry Dock"), seeks damages for an alleged breach of contractual obligations (or, alternatively, a Fifth Amendment "taking") in connection with a financial assistance agreement between Dollar Dry Dock and the Federal Deposit Insurance Corporation ("FDIC"). First Hartford purports to sue derivatively on behalf of Dollar Dry Dock and directly on behalf of itself and a similarly situated class of shareholders.

After a full and careful examination of the pleadings, briefs, and other submissions filed by the parties, this Court grants the defendant's Motion to Dismiss the plaintiff's Complaint.

### Factual Background

Dollar Dry Dock Bank of New York was formed in 1983 as the result of a merger of two financially troubled savings banks, Dollar Savings Bank of New York and Dry Dock Savings Bank. On February 3, 1983, Dollar Savings and Dry Dock entered into an Assistance Agreement with the FDIC for approval of their merger. To facilitate the merger, the FDIC provided financial assistance by issuing two promissory notes to Dollar Dry Dock in return for two capital certificates. In addition, the FDIC also entered into Net Worth Certificate Assistance Agreements with Dollar Dry Dock.[1] As a result of the merger, Dollar Dry Dock became an FDIC-insured, state-chartered, mutual savings bank.

Despite the merger, Dollar Dry Dock still suffered financial losses in 1983 and 1984. Thereafter, in order to enhance its ability to raise capital, Dollar Dry Dock sought approval from the FDIC to convert from a mutually-held institution to a stock-form in-stitution.[2] The FDIC approved the conversion, agreed to cancel the Assistance Agreement, and replaced it with an Amended and Restated Assistance Agreement ("Amended Assistance Agreement") dated July 18, 1986. The purpose of the Amended Assistance Agreement was to provide financial assistance to Dollar Dry Dock. (Amended Assistance Agreement at ¶ 10.13). In July 1986, after the FDIC approved the bank's conversion to stock form, First Hartford purchased and continues to own 20,750 shares of Dollar Dry Dock Class A Convertible Junior Preference Stock.

Pursuant to the Amended Assistance Agreement, Dollar Dry Dock agreed to conform to a Capital Plan, which required Dollar Dry Dock to maintain certain levels of minimum total capital, as defined in 12 C.F.R. § 325.2. In addition, the Amended Assistance Agreement provided that:

> [T]he FDIC may, from time to time, make determinations under 12 C.F.R. § 325.3 to require additional primary and/or total capital (as those terms are defined in the regulation), based upon any change on or after the Commencement Date [July 24, 1986] in the facts, conditions, prospects, assets, or liabilities of or relating to Dollar-Dry Dock.

(Amended Assistance Agreement at art. 8.) Further, it was provided that:

> Total Capital shall not be reduced by goodwill or any other intangible asset arising from the accounting treatment of the Conversion; provided, however, that goodwill or any other intangible asset arising from any other sources shall constitute a reduction from Total Capital to the extent required by any rule, regulation, policy of general application, or order of the FDIC.

(Amended Assistance Agreement at ¶ 1.22.)

For the purposes of determining Dollar Dry Dock's net income, its assets and liabili-

---

1. In analyzing Dollar Dry Dock's claims, it is important to understand the differences between the FDIC's actions in the present case and the regulatory activities in a typical *Winstar* case. In *Winstar* cases, the Government, acting through the Federal Savings and Loan Insurance Corporation ("FSLIC"), negotiated with private investors to provide these funds in exchange for special accounting treatment. *United States v. Winstar Corp.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). The FDIC is providing Dol-

lar Dry Dock with open bank assistance, which means that the FDIC provides cash to the troubled institution on the assumption that such infusions will be less costly than liquidating the institution.

2. The Net Worth Certificate Assistance Agreements required Dollar Dry Dock to obtain prior written approval from the FDIC before converting from mutual to stock form.

ties were to be recorded at fair market value, thereby increasing goodwill.[3] The goodwill "arising solely from recording Dollar–Dry Dock's assets and liabilities at fair market value in connection with the Conversion will be fully amortized on a level-yield basis over the fifteen-year period ending June 30, 2001 * * *." (Amended Assistance Agreement at ¶ 1.12.) In return for the special accounting treatment of supervisory goodwill and the FDIC's approval of the stock conversion, Dollar Dry Dock substituted its obligations under the Assistance Agreement with a subordinated note in the amount of $12,500,000.[4] The subordinated note and the capital certificates were included in Dollar Dry Dock's total capital. Moreover, Dollar Dry Dock agreed to prepay the Net Worth Certificates. According to First Hartford, from the effective date of the Amended Assistance Agreement until December 21, 1990, Dollar Dry Dock amortized approximately $96 million of supervisory goodwill and met its total capital requirements as mandated under the Capital Plan.

On December 21, 1990, Dollar Dry Dock, the FDIC, and the Superintendent of Banks for the State of New York executed a Memorandum of Understanding ("MOU"). Pursuant to the terms of the MOU, Dollar Dry Dock was prohibited from paying cash dividends or making other payments or distributions on its capital stock until it attained a total capital ratio of six percent. This six percent requirement was two percentage points higher than the total capital ratio required under the Capital Plan and the Amended Assistance Agreement. In addition, the MOU required Dollar Dry Dock to address, in its Report of Plans and Objectives submitted pursuant to paragraph 9.16 of the Amended Assistance Agreement, the needs of Dollar Dry Dock, "given its risk profile, to operate with total capital ratios at levels in excess of those set forth in the Capital Plan and to achieve Part 325 capital requirements, absent forbearances, prior to December 31, 1992." (MOU ¶ 3, at B–3.)

On December 19, 1991, Congress enacted the Federal Deposit Insurance Corporation Improvement Act of 1991 ("FDICIA"), Pub.L. No. 102–242, 105 Stat. 2236 (1991). The FDICIA set forth new primary capital requirements for federally insured banks. The FDIC interpreted the FDICIA as prohibiting the inclusion of supervisory goodwill in calculating regulatory capital. Effective December 19, 1992, the FDIC published a final rule that implemented the requirements of the FDICIA. According to that rule, su-

---

**3.** The United States Court of Appeals for the Federal Circuit summarized goodwill as "[u]nder [the purchase method of accounting] ... the book value of the acquired thrift's assets and liabilities was adjusted to fair market value at the time of the acquisition. Any excess in the cost of the acquisition (which included liabilities assumed by the acquirer) over the fair market value of the acquired assets was separately recorded on the acquirer's books as 'goodwill.' In other words, the government agreed to allow the plaintiffs and others in similar circumstances to treat what was a deficit in capital as an asset. Goodwill was considered an intangible asset that could be amortized on a straight-line basis over a number of years. The difference between the aggregate fair market value of liabilities assumed by the acquirer and the aggregate fair market value of the failing thrift's assets was known as 'supervisory goodwill,' in the context of a supervisory merger, and was recorded on the resulting institution's balance sheet as an asset includable in capital for purposes of satisfying [the Bank Board's] minimum capital requirements." *Winstar Corp. v. United States*, 994 F.2d 797, 802 (Fed.Cir.1993) (quoting *Winstar Corp. v. United States*, 21 Cl.Ct. 112, 113 (1990)), *vacated, reh'g*

en banc 64 F.3d 1531 (1995), *aff'd*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). In short, "goodwill" can be defined as any excess in the cost of acquiring another institution over the fair market value of the acquired assets; therefore, goodwill can be considered an intangible asset rather than a deficit in capital. The Federal Circuit also characterized goodwill as "accounting gimmickry." *Winstar*, 994 F.2d at 804.

**4.** In the typical *Winstar* transaction, the FSLIC allowed the use of goodwill as compensation to a healthy depository institution or outside investor for acquiring a failing thrift. These agreements were a bargained-for exchange. The FSLIC negotiated these agreements because it lacked the funds to close the insolvent thrifts. Instead of direct payments to the acquiring institutions, the FSLIC paid in the form of supervisory goodwill.

Here the FDIC is allowing Dollar Dry Dock to attempt to save the institution by converting to a stock form of ownership. Unlike a *Winstar* claim, the FDIC had the funds to liquidate the institution and did not solicit investors to provide the capital it was unable to supply. In addition, the FDIC here explicitly provided that the treatment of goodwill was subject to change.

pervisory goodwill could no longer be included in computing an institution's regulatory capital notwithstanding contractual language to the contrary. As a result, Dollar Dry Dock was unable to meet its capital requirement. Thereafter, on February 21, 1992, the Superintendent of Banks for the State of New York seized Dollar Dry Dock and appointed the FDIC as receiver. That same day, the FDIC sold Dollar Dry Dock's branch banks to third parties.

On December 20, 1996, nearly five years later, the plaintiff filed the present Complaint in this Court and alleged the following six counts against the defendant: (I) breach of contract due to the FDIC's raising of Dollar Dry Dock's capital ratio requirement in the MOU, in alleged violation of the Amended Assistance Agreement; (II) breach of contract because the FDIC directed, recommended, or otherwise caused the Superintendent to seize Dollar Dry Dock; (III) unconstitutional taking under the Fifth Amendment arising from the FDIC's taking of Dollar Dry Dock's contractual right to treat goodwill as a regulatory capital asset and the FDIC's direction or recommendation that the Superintendent seize Dollar Dry Dock; (IV) unconstitutional regulatory taking of contractual rights under the Fifth Amendment arising from the FDIC's decision not to treat Dollar Dry Dock's supervisory goodwill as tangible capital, which was contrary to the reasonable investment-backed expectations of the plaintiff and other shareholders; (V) rescission of shareholders' investment due to the FDIC's change in the treatment of Dollar Dry Dock's supervisory goodwill; and (VI) the plaintiff and other shareholders of Dollar Dry Dock are the intended beneficiaries of the Amended Assistance Agreement between Dollar Dry Dock and the FDIC. Based on these claims, the plaintiff requests that (1) this action be certified as a class action on behalf of all of the shareholders of Dollar Dry Dock; (2) the plaintiff, other shareholders, and Dollar Dry Dock be awarded damages; (3) the plaintiff, other shareholders, and Dollar Dry Dock be awarded the return of their shareholder investments; (4) the damages recovered derivatively be awarded to Dollar Dry Dock in

trust for its shareholders; and (5) costs, attorney's fees, and interest be awarded.

After a careful review and examination of the pleadings, briefs, and other submissions, and after oral arguments, this Court grants the defendant's motion to dismiss all six counts of the plaintiff's Complaint.

### Discussion

This action is before the Court on the defendant's Motion to Dismiss pursuant to United States Court of Federal Claims Rule ("RCFC") 12(b)(1) for lack of subject matter jurisdiction and to RCFC 12(b)(4) for failure to state a claim upon which relief can be granted. In deciding a motion to dismiss, this Court's factual inquiry is limited. The question before this Court is not whether the plaintiff will prevail, but whether or not the plaintiff is entitled to offer evidence to support the facts alleged. *See Juda v. United States,* 6 Cl.Ct. 441, 446 (1984). This Court must take as true all of the facts alleged in the complaint. *See id.*

This Court's jurisdiction is strictly construed. *See McMahon v. United States,* 342 U.S. 25, 27 & n. 5, 72 S.Ct. 17, 96 L.Ed. 26 (1951); *United States v. John C. Grimberg Co.,* 702 F.2d 1362, 1372–74 (Fed.Cir. 1983); *Mega Constr. Co. v. United States,* 29 Fed.Cl. 396, 472 (1993). When the defendant questions this Court's subject matter jurisdiction with a motion pursuant to RCFC 12(b)(1), the burden is on the plaintiff to establish jurisdiction by a preponderance of the evidence. *See Reynolds v. Army and Air Force Exch. Serv.,* 846 F.2d 746, 748 (Fed.Cir.1988); *George W. Kane, Inc. v. United States,* 26 Cl.Ct. 655, 657 (1992); *American Pac. Roofing Co. v. United States,* 21 Cl.Ct. 265, 267 (1990). In deciding a motion to dismiss, this Court must accept all factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff. *See George W. Kane,* 26 Cl.Ct. at 657; *Kinne v. United States,* 21 Cl.Ct. 104, 107 (1990).

Moreover, this Court will not dismiss a complaint pursuant to RCFC 12(b)(4) for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set

of facts in support of his claim which would entitle him to relief." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)); *see also Trauma Serv. Group v. United States,* 104 F.3d 1321, 1325 (Fed.Cir.1997). In addition, this Court must assume that the facts alleged in the Complaint are true and must resolve all reasonable inferences in favor of the plaintiff. *See Davies Precision Mach., Inc. v. United States,* 35 Fed.Cl. 651, 662 (1996). When resolving an RCFC 12(b)(4) motion, if this Court considers matters outside of the pleadings, the motion is treated as one for summary judgment under RCFC 56(c). *See id.*

## I. Breach of Contract Claims

Counts I, II, and VI in First Hartford's Complaint allege a direct right to recover based on breach of contract theories. As will be explained more fully below, the plaintiff has failed to establish jurisdiction to maintain this action on its own behalf, as a third-party beneficiary or derivatively on behalf of Dollar Dry Dock.

 One steadfast rule is that no jurisdiction exists in this Court absent an explicit waiver of sovereign immunity by the United States through an act of Congress. *See United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980); *United States v. Testan,* 424 U.S. 392, 399, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976); *United States v. King,* 395 U.S. 1, 4, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969). The Tucker Act is one such statutory waiver that authorizes jurisdiction over "any claim against the United States founded * * * upon * * * any express or implied contract with the United States * * *." 28 U.S.C. § 1491(a)(1) (1994). Establishing jurisdiction under the Tucker Act requires that a petitioner possess privity of contract specifically encompassing a contractual relationship between itself and the Government. *See Erickson Air Crane Co. v. United States,* 731 F.2d 810, 813 (Fed.Cir. 1984); *Maniere v. United States,* 31 Fed.Cl. 410, 416 (1994); *Thompson Tower Ltd. Dividend Hous. Ass'n v. United States,* 228 Ct.Cl. 766, 771, 1981 WL 21478 (1981). Absent privity of contract, a claimant must demonstrate an exception, such as third-party beneficiary status, to pursue a contract claim in this Court. *See, e.g., Maniere,* 31 Fed.Cl. at 416 & n. 3.

### A. First Hartford Cannot Establish Jurisdiction on Its Own Behalf.

 In its Motion to Dismiss, the defendant contends that the plaintiff lacks standing to sue on its own behalf because First Hartford is not in privity of contract with the Government. It is clear that First Hartford and Dollar Dry Dock's other shareholders were not parties to the Amended Assistance Agreement with the FDIC. (*See* Amended Assistance Agreement at ¶ 1.15); *see also Whited v. United States,* 230 Ct.Cl. 911, 911–12, 1982 WL 25271 (1982) (dismissing the plaintiff's contract claim for lack of jurisdiction because the plaintiff was not a party to the contract in question); *S.R. Weinstock & Assocs., Inc. v. United States,* 223 Ct.Cl. 677, 680, 1980 WL 99731 (1980) (finding that a shareholder individually cannot bring an action against the United States because he does not stand in privity of contract with the United States). *But see Statesman Sav. Holding Corp. v. United States,* 41 Fed.Cl. 1, 18 (1998) (investors turned plaintiffs were able to recover restitution because they were signatories to the contract at issue). Since no privity of contract exits, the plaintiff cannot establish jurisdiction to assert breach of contract claims against the defendant in this Court. Thus, this Court dismisses Counts I, II, and VI of the Complaint to the extent that First Hartford is alleging breach of contract claims on its own behalf.

### B. First Hartford Cannot Establish Jurisdiction as a Third–Party Beneficiary.

The defendant also contends that the plaintiff lacks standing to sue and that this Court lacks jurisdiction to hear Dollar Dry Dock's claims based on its third-party beneficiary status, because the contract between Dollar Dry Dock and the FDIC contains a disclaimer of the rights of third parties. According to the defendant, this issue is governed by this Court's prior decisions in *Slattery v. United States,* 35 Fed.Cl. 180, 184

(1996), and *Maniere,* 31 Fed.Cl. at 418–19, both of which held in part that disclaimer clauses in the contracts negated any intent to benefit persons other than the parties to the contracts. In opposing the defendant's Motion to Dismiss, the plaintiff contends that the disclaimers in *Slattery* and *Maniere* are distinguishable from the disclaimer clause in Dollar Dry Dock's Amended Assistance Agreement and that the issue is a question of fact that cannot be resolved until the plaintiff has had the opportunity to conduct discovery.

It is clear that First Hartford and Dollar Dry Dock's other shareholders were not parties to the Amended Assistance Agreement with the FDIC. *See supra* part I.A. Since no privity of contract exits, the plaintiff must demonstrate that it is an intended third-party beneficiary of the contract for this Court to exercise jurisdiction [5] over these breach of contract claims. *See Montana v. United States,* 124 F.3d 1269, 1273 & n. 6 (Fed.Cir.1997); *Mike Carlow and Carlow Enter. v. United States,* 40 Fed.Cl. 773, 779–80 (1998). The proper test for determining third-party beneficiary status is whether or not the contract reflects the express or implied intention of the parties to benefit the party claiming third-party beneficiary status. *See Montana,* 124 F.3d at 1273 (adopting the third-party beneficiary test as described in *Schuerman v. United States,* 30 Fed.Cl. 420, 433 (1994)).[6] The intended third-party beneficiary also need *not* be specifically or individually identified in the contract but must fall within a class clearly intended to be benefitted thereby. *See id.* One way to ascertain such intent is to ask whether or not the beneficiary would be reasonable in relying on the promise as manifesting an intention to confer a right upon it. *See id.*

The Complaint alleges that "[t]he plaintiff and all shareholders of Dollar Dry Dock are the intended beneficiaries of the Amended Assistance Agreement between Dollar Dry Dock and the FDIC." (Compl. at 17.) However, despite the plaintiff's allegation, this Court can find no evidence that First Hartford or any other shareholders of Dollar Dry Dock were intended third-party beneficiaries of the Amended Assistance Agreement. *See Suess v. United States,* 33 Fed.Cl. 89, 94 (1995) (stating that "while in certain unusual circumstances a third-party beneficiary status may be accorded to a shareholder, generally this has not been the case.").

The Amended Assistance Agreement also contains a disclaimer provision defining and limiting the intended beneficiary of the agreement:

> Except as otherwise provided in this Agreement, nothing expressed or referred to in this Agreement is intended or shall be construed to give any Person other than the Parties any legal or equitable right, remedy, or claim under or in respect of this Agreement or the Subordinated Note, or any provisions herein or therein contained, it being the intention of the Parties hereto that this Agreement and the Subordinated Note, the obligations and statements of responsibilities hereunder and thereunder, and all other conditions and provisions hereof and thereof, are for the sole and exclusive benefit of such Parties and for the benefit of no other Person.

---

**5.** Although both parties seemingly interchange the lack of standing and jurisdiction in arguing whether First Hartford has third-party beneficiary status, the first issue is whether this Court has jurisdiction under 28 U.S.C. § 1491(a)(1), which requires an express or implied contract; therefore, the privity of contract issue and its substitute, third-party beneficiary status, are first issues of jurisdiction and not of standing. *See Maniere,* 31 Fed.Cl. at 416 n. 3 (1994).

**6.** Prior to the Court of Appeals for the Federal Circuit's acceptance of the *Schuerman* third-party beneficiary test in *Montana v. United States,* the test to determine whether or not a third party could sue as an intended third-party beneficiary was two-pronged: (1) that the contracting parties intended to directly benefit the third party, and (2) that the contract reflected the intent to give the third party the direct right to compensation or to enforce that right against the promisor. *See Baudier Marine Elecs. v. United States,* 6 Cl.Ct. 246, 249 (1984), *aff'd,* 765 F.2d 163 (Fed. Cir.1985), *quoted in Clean Giant, Inc. v. United States,* 19 Cl.Ct. 390, 394 (1990). *But see National Sur. Corp. v. United States,* 31 Fed.Cl. 565, 575–76 (1994), *aff'd on other grounds,* 118 F.3d 1542 (Fed.Cir.1997); *Schuerman,* 30 Fed. Cl. at 429 (rejecting the second prong of the *Baudier* test as inapplicable unless members of the general public bring suit against promisors who contract with the Government to render a public service).

(Amended Assistance Agreement at ¶ 10.1.) This disclaimer shows that the FDIC and Dollar Dry Dock specifically intended *not* to benefit First Hartford or any other shareholders in the performance of their respective rights and obligations under the Amended Assistance Agreement. Therefore, insufficient evidence exists for the plaintiff to prove its third-party beneficiary status. *See Slattery*, 35 Fed.Cl. at 184 (dismissing the contract claim because the contract in question contained a similar contract disclaimer that specifically excluded benefits to any third party); *see also Maniere*, 31 Fed.Cl. at 418–19 (disallowing third-party beneficiary status because a contract provision specifically excluded benefits to any third party).

The plaintiff attempts to distinguish *Slattery* and *Maniere* by alleging that the phrase "[e]xcept as otherwise provided in this Agreement" contained in the disclaimer, together with the fact that the purpose of the Agreement was to "convert [Dollar Dry Dock] to stock form," collectively conferred third-party beneficiary status on First Hartford and the other shareholders. (*See* Amended Assistance Agreement at ¶ 10.1.) This Court agrees that the main purpose of the Amended Assistance Agreement was to convert Dollar Dry Dock from mutual to stock form, but that language alone is not sufficient to establish, on the part of the parties to the agreement, an intent to excuse First Hartford and the other shareholders from the third-party disclaimer in paragraph 10.1 of the Agreement. *See Slattery*, 35 Fed.Cl. at 184–85.

7. *See Slattery*, 35 Fed.Cl. at 185 (following the reasoning in *Maniere* that courts must look to the explicit language of contracts when determining if third-party beneficiary status exists).

8. Moreover, the mere ownership of shares and the right to receive dividends does not exempt First Hartford and the other shareholders from the effect of the disclaimer. *See Slattery*, 35 Fed.Cl. at 185.

9. The court in *Whited v. United States*, 230 Ct.Cl. 963, 965 (1982), *cert. denied*, 459 U.S. 871, 103 S.Ct. 157, 74 L.Ed.2d 131 (1982), proposed that the plaintiffs pursue their stockholder derivative action under Fed.R.Civ.P. 23.1 in the appropriate United States District Court.

■■■ This Court must look to the specific language of the contract when determining the existence of third-party rights,[7] and none of the above-mentioned language, nor any other provision of the Amended Assistance Agreement, provides First Hartford with any legal right, remedy, or claim against the FDIC.[8] Moreover, First Hartford, as a simple investor, does not fall within a class clearly intended to benefit from the agreement, and it would not be reasonable for First Hartford to rely on the Amended Assistance Agreement as manifesting any intent to confer any rights or benefits upon it. *See Montana*, 124 F.3d at 1273.

Therefore, First Hartford is unable to demonstrate third-party beneficiary status and cannot establish jurisdiction to assert breach of contract claims against the defendant in this Court. Thus, this Court dismisses Counts I, II, and VI of the Complaint to the extent that First Hartford is alleging breach of contract claims as a third-party beneficiary under the Amended Assistance Agreement at issue.

C. First Hartford Cannot Establish Jurisdiction Derivatively.

The plaintiff further alleges, as a shareholder of Dollar Dry Dock, that it has the ability under *Slattery* and *Suess* to bring a shareholder derivative action against the Government for breach of contract. Since the plaintiff is not a party to the Amended Assistance Agreement and cannot establish third-party beneficiary status, the derivative action is essentially its last chance[9] to establish standing and jurisdiction in this Court on contractual theories of recovery.[10] Nonethe-

10. This Court has already decided it lacks jurisdiction to hear any claims brought by the plaintiff as an individual or as a third-party beneficiary. *See supra* parts I.A. and I.B. However, this Court would have jurisdiction to hear Counts I and II of the Complaint if brought by a proper party, such as the FDIC as receiver, because both counts allege breach of contract claims that are well within this Court's Tucker Act jurisdiction. The issue to decide is whether or not this Court possesses shareholder derivative suit jurisdiction, and, if so, whether or not the plaintiff then possesses the proper standing as a shareholder to bring a derivative action in this Court.

less, a plaintiff must still establish jurisdiction and demonstrate standing based on the rules and prior decisions of this Court, because equitable pleas and remedies have never been an integral part of this Court's jurisdiction or decision-making process. *See Mitchell,* 445 U.S. at 538, 100 S.Ct. 1349.

### 1. No Shareholder Derivative Suit Rule Exists in the RCFC

Under 28 U.S.C. § 2071 (1994), this Court may prescribe rules (*i.e.,* RCFC) for the conduct of its business, just as 28 U.S.C. § 2072 (1994) authorizes the promulgation of rules of civil procedure for the district courts (*i.e.,* Federal Rules of Civil Procedure). *See Whited v. United States,* 230 Ct.Cl. 963, 964–65, 1982 WL 1408 (1982), *cert. denied,* 459 U.S. 871, 103 S.Ct. 157, 74 L.Ed.2d 131 (1982); *Quinault Allottee Ass'n v. United States,* 197 Ct.Cl. 134, 137, 453 F.2d 1272 (1972). Within this rule-making authority, this Court has never adopted a counterpart to Rule 23.1 of the Federal Rules of Civil Procedure ("FRCP") which allows shareholders to file derivative actions on behalf of their respective corporations. *See Whited,* 230 Ct.

Cl. at 965; *see also Sermor, Inc. v. United States,* 13 Cl.Ct. 1, 3 n. 5 (1987). The lack of a rule allowing shareholder derivative actions follows this Court's tenet that no jurisdiction exists absent a clearly expressed waiver of sovereign immunity by the United States.[11] *Mitchell,* 445 U.S. at 538, 100 S.Ct. 1349; *Testan,* 424 U.S. at 399, 96 S.Ct. 948; *King,* 395 U.S. at 4, 89 S.Ct. 1501. Absent privity of contract or third-party beneficiary status, this Court would need to imply a waiver of sovereign immunity to enable First Hartford to sue the Government in an attempt to reach an equitable solution, albeit partly monetary, for a petitioner who presently fails to show jurisdiction and lacks standing to sue in this Court.

### 2. Binding Precedent Prevents Bringing a Derivative Action

■ In the absence of a shareholder derivative suit rule, this Court is bound by precedent established by the United States Court of Claims, the predecessor court of the Federal Circuit,[12] in the *Whited* cases [13] which clearly hold that this Court does *not* have

---

**11.** The absence of a derivative suit rule in the RCFC is purposeful and based on a lack of jurisdiction rather than a mere oversight of this Court's Rules Committee. The "Contents" section of the RCFC states:

"The rules of the United States Court of Federal Claims are based upon the Federal Rules of Civil Procedure (Fed.R.Civ.P. or the Federal Rules). For ease of reference to rulings in Federal Rules Decisions on comparable rules, chapter titles and rule numbers of the Court of Federal Claims rules follow closely the Fed.R.Civ.P. *Amendments and additions to the Federal Rules have been made as required to give effect to the jurisdictional differences of the Court of Federal Claims. Federal Rules which are not applicable to the Court of Federal Claims have been omitted,* and subdivisions of the Federal Rules that have not been used, either in amended or supplemented form, are so designated.

"Federal Rules Of Civil Procedure *Omitted*
\* \* \* \*

"Rule 23.1 Derivative Actions by Shareholders."
*See* 28 U.S.C. app. RCFC at 950 (emphasis added).

**12.** *See South Corp. v. United States,* 690 F.2d 1368, 1370 (Fed.Cir.1982).

**13.** The *Whited* cases consist of three separate opinions, all of which support the holding that this Court does not have jurisdiction to consider shareholder derivative suits. In *Whited Co. v.*

*United States,* 229 Ct.Cl. 623, 1981 WL 22080 (1981), the United States Court of Claims (the Court of Federal Claims' predecessor court) held that the Whited Company could not bring suit against the United States through the representation of one of its shareholders, Mr. Randall K. Whited, because the court required that a corporation be represented by an attorney. *See id.* at 623–24. Next, the two shareholders of the Whited Company, Mr. and Mrs. Whited, filed the same suit *pro se.* The United States Court of Claims again dismissed the complaint because the plaintiffs lacked privity of contract and therefore the Court lacked jurisdiction and the plaintiffs lacked standing. *See Whited v. United States,* 230 Ct.Cl. 911, 911–12 (1982). Finally, Mr. and Mrs. Whited filed the same suit styled as a "stockholder derivative action," which the Court of Claims again promptly dismissed because its prior decisions were clear that a shareholder may not bring suit as an individual alleging breach of contract with the United States. *See Whited v. United States,* 230 Ct.Cl. 963, 965–66, *cert. denied,* 459 U.S. 871, 103 S.Ct. 157, 74 L.Ed.2d 131 (1982).

Although the plaintiff in the instant case tries to distinguish the facts of the *Whited* cases from its own suit, purportedly filed on behalf of the corporation and not for its own benefit, the *Whited* cases make clear that this Court's jurisdiction does not include consideration of shareholder derivative suits.

jurisdiction to adjudicate stockholder derivative claims. *See Whited,* 230 Ct.Cl. at 965; *but see Suess,* 33 Fed.Cl. at 93–94, and *Slattery,* 35 Fed.Cl. at 183–84 (finding that this Court has jurisdiction and that the parties have standing to file shareholder derivative suits).

The United States Court of Appeals for the Federal Circuit has not had occasion to resolve the issue of whether or not this Court has jurisdiction over shareholder derivative actions. *See Branch v. United States,* 69 F.3d 1571, 1575 (Fed.Cir.1995), *cert. denied,* 519 U.S. 810, 117 S.Ct. 55, 136 L.Ed.2d 18 (1996) (declaring that "[t]his court [Federal Circuit] has not had occasion to address the question whether the Court of Federal Claims has jurisdiction over shareholder derivative actions, and we do not find it necessary to resolve that question in this case."); *see also California Hous. Securities, Inc. v. United States,* 959 F.2d 955, 957 n. 2 (Fed. Cir.1992), *cert. denied,* 506 U.S. 916, 113 S.Ct. 324, 121 L.Ed.2d 244 (1992) (declining to decide whether or not the Court of Federal Claims has jurisdiction over shareholder derivative suits because 12 U.S.C. § 1821(d)(11)(B) gave the sole shareholder standing to sue on behalf of the corporation based on the corporation's direct interest in the surplus of the bank/corporation's liquidated assets). The court in *Branch,* however, did recognize the precedent of *Whited* and noted that only recently has this Court distinguished *Whited* by holding in *Suess* that the absence of a specific rule authorizing shareholder derivative actions does not jurisdictionally bar this Court from entertaining shareholder derivative claims brought against the United States. *See Branch,* 69 F.3d at 1574–75.

Both *Branch* and *California Housing,* are distinguishable from the present case be-cause First Hartford is neither the trustee of the bank, nor the sole owner, and does not have a direct vested interest in any surplus created by the liquidation of Dollar Dry Dock. This case is factually distinct from both *Branch* and *California Housing* be-cause, in the instant case, Dollar Dry Dock appears not to have been completely liquidated by the receiver, the FDIC, although Dollar Dry Dock's branch offices appear to have been sold. (Compl. at ¶ 42.) Furthermore, the plaintiff's Complaint does not allege that a surplus will be created or even that Dollar Dry Dock's debt would be paid off if their derivative suit proves successful.

### 3. *Suess* Should Not be Followed

Despite the lack of a rule allowing shareholder derivative suits, and the *Whited* precedent, this Court recently allowed a shareholder of a failed depository institution to bring a shareholder derivative action in the *Suess* case. In its Motion to Dismiss, the defendant contends that this Court's decision in *Suess* was in error and should be reconsidered. The defendant argues that the *Suess* case was incorrectly decided in light of the Court of Claims' decisions in the *Whited* cases, which prohibit plaintiffs from bringing shareholder derivative actions in this Court. In its response to the defendant's Motion to Dismiss, the plaintiff maintains that the holdings in *Suess* and *Slattery,* which found that this Court possessed jurisdiction to hear shareholder derivative suits, should be followed.

This Court respectfully declines to follow the rationale set forth in *Suess* and *Slattery,* allowing the filing of shareholder derivative suits in this Court; instead, it must rely on the precedent in *Whited* declining such jurisdiction.[14] To begin with, the reading of *Quinault* put forth in *Suess* to support the allowance of the derivative suit was misplaced and

---

14. The Court in *Whited* stated, "[w]hile we might have done so, we have never adopted a counterpart to Federal Rule of Civil Procedure 23.1, allowing stockholders to sue the Government on behalf of their corporation. *Cf. Quinault Allottee Association v. United States,* 197 Ct.Cl. 134, 137–139, 453 F.2d 1272, 1274–1275 (1972) (notions similar to those under Fed.R.Civ.P. 23 are applicable to class actions in the Court of Claims). In the absence of such a rule, this panel of the court is clearly bound by our previous decisions in *Algonac Mfg. Co., supra [v. United States,* 198 Ct.Cl. 258, 260–61, 458 F.2d 1373, 1375 (1972)], and *S.R. Weinstock & Associates, Inc., supra,* and, indeed, our recent decision in *Whited v. United States, ante* at 623–24, *supra.* Those decisions are clear that a shareholder, even a majority or sole shareholder, may not bring suit as an individual alleging breach of his corporation's contract with the United States." *Whited,* 230 Ct.Cl. at 965; *see also Sermor, Inc. v. United States,* 13 Cl.Ct. 1, 3 (1987).

should not be applied in this case. In *Quinault,* the court permitted the plaintiffs to proceed against the Government in a type of class action, despite the fact that the Court of Claims had not yet adopted a rule comparable to FRCP 23, allowing for class action suits. The court found that the plaintiff's claims were within the court's jurisdiction and that no statute prohibited the court from using judicial aids, such as a class action. *See Quinault,* 197 Ct.Cl. at 137–39, 453 F.2d 1272. However, just because this Court once before looked to the Federal Rules of Civil Procedure in an effort to use "new procedural techniques" that "aid [in] speedier and less repetitious litigation" does not imply an ability to interchange the Federal Rules of Civil Procedure for this Court's rules whenever a constrained party cannot by itself establish jurisdiction.

In *Quinault,* FRCP 23 was not employed in an effort to allow the plaintiffs to gain jurisdiction or standing in this Court. Rather, the plaintiffs, potentially numbering over one thousand American Indians of the Quinault Reservation, already had established jurisdiction *individually* to recover administrative charges deducted by the Government from the proceeds of timber sales from individual Indian allotments on the Quinault Reservation. *See id.* at 136–37. In addition, FRCP 23 was not used to certify and establish the typical class action suit; rather, the court used the theory of a class action only as a progressive procedural technique[15] in deciding which claimants could receive mone-

tary awards in a fair and efficient manner.[16] The circumstances underlying the borrowing of a principle in the FRCP differs significantly between *Quinault's* use of a classification device and First Hartford's plea for acceptance of a shareholder derivative suit. If the *Quinault* court declined to accept the use of the class action, each American Indian could have filed suit individually against the United States in the United States Court of Claims. However, in First Hartford's situation, no shareholder has established jurisdiction under the Tucker Act or through any exception to the requirement that sovereign immunity be waived. If First Hartford's derivative suit is rejected, it cannot obtain relief in this Court on its contractual claims.

This jurisdictional distinction was disregarded in *Suess.* In *Suess,* the Court stated that it was inconsequential that each plaintiff in *Quinault* had established jurisdiction and individual standing:

> The government, in an attempt to distinguish *Quinault,* argues that the plaintiffs in that case were allowed to bring a class action only because each member of the class already had standing to bring his or her individual claims. This argument, however, misreads the definition of a derivative suit. \* \* \* [P]laintiff-shareholders in a derivative suit bring their claims not on their own behalf, but on behalf of the corporation itself. They are not suing on any contractual right of their own, but on the rights held by the corporate entity.

---

**15.** The court in *Quinault* did not go as far as FRCP 23 to bind absent members of the potential class. Rather, the Court allowed a type of "opt-in" class, whereby if claimants decided not to join the class action suit, those claimants could simply individually file a motion for leave to intervene as a plaintiff. *Quinault,* 197 Ct.Cl. at 140, 141–42, 453 F.2d 1272.

**16.** Since the court's use of the class action device in *Quinault,* the Court has adopted its own class action enabling rule, "RCFC 23. Class Action." But following the reasoning of *Quinault,* the rule states, "[a] motion to certify a class action shall be filed with the complaint and comply with Rule 3(c), with service to be made as provided in Rule 4. The court shall determine in each case whether a class action may be maintained and under what terms and conditions." RCFC 23. It should be stressed that after *Quinault* this

Court found it useful to adopt its own version of a "class action" rule, but after *Suess* and *Slattery* no shareholder derivative action rule was adopted by this Court.

Interestingly, this Court's class action rule went through considerable change while being used and applied in limited circumstances. By 1982, the Claims Court had adopted a long-worded Rule 23 Class Action that mirrored FRCP 23. *See* 28 U.S.C. app. RCFC at 759–60 (1982). But, by 1994, the Court of Federal Claims had revised and reduced the class action rule to two sentences, which allowed for judges to apply class action principles only when needed on a case-by-case basis. The adoption and revision of the class action rule over the last twenty or more years since its initial use in *Quinault,* demonstrates the caution needed in expanding this Court's jurisdiction and trial procedures.

Thus, it is illogical to argue that plaintiffs in a derivative suit must have standing as individuals in order to bring their action—*the derivative nature of the suit makes their standing as individuals irrelevant.* *Suess,* 33 Fed.Cl. at 93–94.

Although it may be true that the nature of a derivative suit makes the standing of an individual "irrelevant," standing by itself is irrelevant, if this Court does not have jurisdiction to consider a plaintiff's shareholder derivative action. Although this standing and jurisdictional debate is often muddled, it is clear that this Court does not possess general equitable powers, and its "jurisdiction to grant relief depends wholly upon the extent to which the United States has waived its sovereign immunity to suit and that such a waiver cannot be implied but must be unequivocally expressed." *United States v. King,* 395 U.S. 1, 4, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969) (holding that in the absence of an express grant of jurisdiction from Congress, the Court of Claims does not possess the authority to issue declaratory judgments). The *Suess* court even recognized that "[d]erivative suits are nominally considered equitable actions * * * [and] that absent statutory authorization, this court cannot grant equitable relief." *Suess,* 33 Fed.Cl. at 92. However, *Suess* notes that although this Court has been denied the power to grant nonmonetary equitable relief, such as injunctions, declaratory judgments, or specific performance, it can still use the equitable concepts of rescission and reformation. *See id.* at 92 (citing *Quinault,* 197 Ct.Cl. at 138 n. 1, 453 F.2d 1272; *Pauley Petroleum, Inc. v. United States,* 219 Ct.Cl. 24, 591 F.2d 1308 (1979), *cert. denied,* 444 U.S. 898, 100 S.Ct. 206, 62 L.Ed.2d 133 (1979); *Klamath & Modoc Tribes & Yahooskin Band of Snake Indians v. United States,* 174 Ct.Cl. 483, 1966 WL 8850 (1966)). Although this Court does have some very limited equitable powers, it has always been a court of law and not of equity. Moreover, any equitable or declaratory actions taken by this Court are very specific and limited by statutory authority. *See King,* 395 U.S. at 4,

89 S.Ct. 1501; *see also* 28 U.S.C. § 1507 (1994) and 26 U.S.C. § 7428 (1994) (allowing this Court to issue declaratory judgments in very specific tax cases); *see also* 28 U.S.C. § 1491(a)(2) (allowing for specific, nonmonetary declaratory relief); 28 U.S.C. § 1491(a)(3) (claims based upon contracts brought prior to award of the contracts).

The *Suess* court also argues that because the plaintiff in its case sought contract damages in the form of monetary relief, the Court had jurisdiction over the claims. *See Suess,* 33 Fed.Cl. at 93. This Court, however, cannot simply rely on the relief sought to create jurisdiction, especially if the Court has previously lacked jurisdiction over shareholder derivative suits.[17]

Congress defines the jurisdiction of this Court, and a party lacking privity of contract with the Government should not be given carte blanche jurisdiction just because they seek money damages. This Court and its Rules Committee need to review the issue of shareholder derivative suits before this Court should assume jurisdictional authority which Congress has not granted and which was previously rejected by the United States Court of Claims. *See Whited,* 230 Ct.Cl. at 965.

If this Court were to accept the use of shareholder derivative suits, absent an authorizing rule analogous to FRCP 23.1, the Court would, in effect, be creating a new jurisdictional exception to the privity of contract requirement, similar to the third-party beneficiary status exception. *Cf. Maniere,* 31 Fed.Cl. at 416 & n. 3. (discussing third-party beneficiary status as a jurisdictional exception to the Tucker Act's privity of contract requirement).

#### 4. Surety Status Privity Exception Not Applicable

In an alternative argument, the plaintiff argues that privity of contract is not always a jurisdictional requirement, because, in the past, certain plaintiffs lacking privity of contract, but possessing surety status, have been allowed to sue the Government on

---

17. Similarly, this Court cannot assume jurisdiction over an implied-in-law contract simply because a plaintiff seeks contract damages in the form of a monetary award. *See Hercules Inc. v. United States,* 516 U.S. 417, 423, 116 S.Ct. 981, 134 L.Ed.2d 47 (1996).

behalf of the original Government contractor. Despite limited exceptions, it is fundamental that the United States is immune from suit except to the extent that it waives sovereign immunity. *See Mitchell,* 445 U.S. at 538, 100 S.Ct. 1349; *Federal Ins. Co. v. United States,* 29 Fed.Cl. 302, 303–04 (1993). As previously stated, the Tucker Act is one means by which the United States has waived its immunity and has given this Court jurisdiction to hear the parties' claims founded in contract against the Government. *See* 28 U.S.C. § 1491(a)(1). Therefore, absent privity of contract, a claimant lacks standing to sue the Government for breach of contract, and this Court is without jurisdiction to resolve such claims. *See Erickson Air Crane Co. v. United States,* 731 F.2d 810, 813 (Fed.Cir.1984); *Kanehl v. United States,* 38 Fed.Cl. 89, 99 (1997) [18]; *Hemphill Contracting Co. v. United States,* 34 Fed.Cl. 82, 84 (1995).

 Plaintiffs, with monetary interests in Government contracts, are routinely denied jurisdiction and standing to sue in this Court because they are not in privity of contract with the Government. For example, the Federal Circuit has limited the scope of the Tucker Act's waiver of sovereign immunity in cases where subcontractors or materialmen sue in their own names to recover payments owed by the Government for work performed and materials used under Government contracts. This Court has repeatedly rejected these claims and maintained that the Tucker Act only allows suit if privity of contract exists between the claimant and the Government. *See Erickson Air Crane Co.,* 731 F.2d at 813 (stating, "[t]he government consents to be sued only by those with whom it has privity of contract, which it does not have with subcontractors"); *see also Federal*

*Ins. Co. v. United States,* 29 Fed.Cl. 302, 304 (1993). The Tucker Act also does not waive sovereign immunity to allow a Government contractor's general liability insurer to seek recovery against the Government for disputed insurance payments made to Government employees. *See Federal Ins.,* 29 Fed.Cl. at 302–03. The Court reasoned that the insurer still lacked privity of contract and that the insurer's subrogation clause was narrow in scope and did not purport to place the plaintiff/insurer in the Government contractor's shoes with respect to contractual obligation with the Government. *See id.* at 305–06. The Court in *Federal Insurance* further stated that Congress never "intended to authorize suit by parties who have no direct responsibility for contract performance and no other obligation owed directly to the government." *Id.* at 306. However, the Federal Circuit has allowed sureties to bring suit in their own names against the Government in cases where the sureties have written performance or payment bonds and which subsequently undertook contract performance to secure payments due under a contract. *See Balboa Ins. Co. v. United States,* 775 F.2d 1158, 1160–62 (Fed.Cir.1985); *Federal Ins.,* 29 Fed.Cl. at 304–05. The distinction of a surety's standing in this Court, as opposed to a subcontractor's, a materialman's, or Government contractor's insurer, is that a suretyship is the result of a three-party agreement, whereby one party (the surety) becomes liable for the obligor's (Government contractor) debt or duty to the third-party obligee (Government); therefore, the surety "is as much a party to the Government contract as the contractor." *Balboa,* 775 F.2d at 1160.

---

**18.** First Hartford cites *Kanehl v. United States,* 38 Fed.Cl. at *99* ("[a]bsent privity, a party has no standing to sue, and the court is without jurisdiction"), for the proposition that the *Suess* and *Slattery* cases "implicitly" held that Congress waived sovereign immunity with respect to the breach of contract derivative actions brought by the shareholders, who lacked privity of contract with the Government; because to hold otherwise, the Court would have had to dismiss the derivative claims in those cases for lack of jurisdiction. However, this Court's jurisdiction, and Congress' decision to waive sovereign immunity, cannot be implied and must be unequivocally

expressed. *See Mitchell,* 445 U.S. at 538, 100 S.Ct. 1349.

The *Kanehl* case, however, does represent one of the limited exceptions or circumstances of equitable relief in which a party lacking privity of contract may still have standing to sue the Government by way of a congressional reference action. *See Kanehl,* 38 Fed.Cl. at 99–100 (citing 28 U.S.C. §§ 1492, 2509); *see also Schutt Constr. Co. v. United States,* 173 Ct.Cl. 836, 841, 353 F.2d 1018 (1965) (deciding in a congressional reference case that a subcontractor, lacking privity of contract, could still seek and recover equitable relief).

In the present case, First Hartford analogizes itself to a surety in an attempt to convince this Court that it too possesses the requisite standing to pursue its suit against the Government. This Court agrees with the defendant that the sureties in the cited cases, however, took on the performance of contractual obligations owed to the Government, and their right to sue the Government derived from their assumption of those contractual obligations. First Hartford, however, has not "taken over" the performance of contractual obligations owed to the Government; it merely purports to take over Dollar Dry Dock's right to sue the Government. Furthermore, First Hartford has never assumed any financial or contractual obligation for Dollar Dry Dock and stands to lose only its own voluntary and limited liability investment in Dollar Dry Dock's stock.

### 5. Judicial Economy Counsels Against Recognizing Derivative Suits

The United States Court of Federal Claims, for good reasons, has not adopted a rule allowing derivative suits. A rule allowing shareholder suits would be likely to clog this Court with meritless claims and duplicative suits unrelated to the determination of contract claims against the Government. For example, a disgruntled shareholder, who lost his investment as a result of a disputed Government contract or perhaps newly enacted federal legislation, would be able to circumvent the Tucker Act's privity of contract requirement and file a shareholder derivative suit in this Court against the United States. The Court also faces the prospect of multiple claims from competing groups of shareholders. This scenario may be simplistic, yet it still illustrates that under the reasoning of *Suess* and *Slattery,* this Court must consider and decide shareholder derivative suits absent clear congressional intent to waive the sovereign immunity of the United States. *See Mitchell,* 445 U.S. at 538, 100 S.Ct. 1349; *Testan,* 424 U.S. at 399, 96 S.Ct. 948; *King,* 395 U.S. at 4, 89 S.Ct. 1501.

The Court of Federal Claims, in particular, has specific and narrowly defined subject matter jurisdiction under the Tucker Act because of its special status to adjudicate claims against the United States. Congress must create additional exceptions to this Court's jurisdictional limitation, and this Court should not leap to create exceptions based on factually sensitive cases revolving around the *Winstar* litigation.

Granting shareholders the right to bring derivative actions in this Court will also force this Court into the role of a receiver. If First Hartford's claim were allowed, this Court would be required to allocate funds to parties with claims on the assets of Dollar Dry Dock. This is the role of the FDIC as receiver and is not the proper role of the federal judiciary, or at least it is not the proper role for this Court.

### 6. If Derivative Suits Were Allowed in the Court of Federal Claims, Plaintiff Still Fails to State a Claim

Even if this Court possessed jurisdiction to hear plaintiffs shareholder derivative claim, the plaintiff still has failed to state a claim upon which relief can be granted. First Hartford has failed to comply with the formalities of bringing a shareholder derivative action and, more importantly, has ignored the FDIC's role as receiver in the applicable federal banking regulations.

#### a. Plaintiff Failed to Follow the Formalities of Bringing a Derivative Suit

The elements needed to establish a derivative suit in a federal district court were not discussed, analyzed, or analogized in *Suess, Slattery,* or by the plaintiff in the instant case. In federal district courts, shareholder derivative suits are governed by FRCP 23.1. Under Rule 23.1, a plaintiff must meet requirements, beyond the mere ownership of stock, to bring a shareholder derivative suit in federal court. *See* 7C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* §§ 1826–1835 (2d ed.1986); 19 *Am.Jur.2d Corporations* §§ 2243–2502 (1986). In *Quinault,* the Court analyzed the claimant's ability to meet some of the criteria of FRCP 23, before allowing the plaintiffs to proceed. *Quinault,* 197 Ct.Cl. at 137, 140–41, 453 F.2d 1272.

The plaintiff does not address the basic derivative suit requirements contained in FRCP 23.1. Particularly, the plaintiff failed

to address the impact that the FDIC receivership had on its ability to maintain a derivative suit:

> A unique impediment to a complaining shareholder's ability to pursue a derivative suit occurs when the corporation is placed in receivership by a state or federal court. All of the corporation's rights of ownership when it is in receivership, including the right to bring a derivative suit, vest in the court-appointed receiver. Upon his refusal to initiate an action on behalf of the corporation, a shareholder may do so but only after the receiver has been joined as a defendant with the consent of the appointing court.

7C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1834. However, in this case, the Superintendent of Banks for the State of New York and not this or any other court appointed the FDIC as receiver. Also, as of yet, the FDIC has not definitively rejected taking action on behalf of the corporation [19] and the FDIC has not been joined as a named defendant. The plaintiff's failure to account for what role the FDIC will take in this case undermines the plaintiff's effort to convince this Court that it should be allowed to proceed with its claims as a shareholder derivative suit.

### b. Plaintiff is not the Proper Party to Bring a Claim

The plaintiff also argues that this Court should grant it derivative standing to protect the rights of the shareholders. According to First Hartford, the shareholders of a depository institution with a valid *Winstar*-type breach of contract claim, will be treated differently depending on whether or not the financial institution was strong enough to absorb the losses generated by the Government's change in policy. If the depository institution survives the Government's actions, as in *Winstar*, it has standing to bring suit in this Court; however, if the depository institution fails, and shareholder derivative suits are not allowed, the claim disappears, eliminating the shareholders' claims on the United States Treasury. This argument is compelling at first glance, and it appears to be a driving force behind other *Winstar*-related cases.[20]

Plaintiff relies on *Mount Sinai Medical Center of Greater Miami v. United States*, 13 Cl.Ct. 561 (1987), for the proposition that this Court *must* exercise jurisdiction over money claims against the Sovereign where Congress has not provided a forum. However, *Mount Sinai* was overruled by *St. Vincent's Medical Center v. United States*, 32 F.3d 548, 552 (Fed.Cir.1994). In addition, this proposition ignores the role that Congress created for the FDIC as receiver of failed depository institutions. In fact, under the statutory scheme created by Congress, the outcome should be identical for surviving and for failed depository institutions.

Even if derivative claims were allowed in this Court, First Hartford would not be able to recover damages and be granted a judgment, because these claims belong to the FDIC as the receiver. In *Pareto v. FDIC*, 139 F.3d 696 (9th Cir.1998), shareholders in a failed national bank attempted to bring a derivative claim against some members of the bank's former board of directors for violations of their duties of care and loyalty under California law. *Id.* at 698. Even though derivative claims are allowed under FRCP 23.1, the court dismissed the shareholders' claims under 12 U.S.C. § 1821(d)(2)(A)(i) (1994), which provides that the FDIC as receiver succeeds, as a matter of law, to "all rights, titles, powers, and privileges of the insured depository institution, and of any stockholder, member, account-

---

**19.** In a letter to First Hartford, dated October 21, 1996, the FDIC Receivership Group Goodwill Unit stated that they "are currently looking into the goodwill claim * * * and will respond more fully once [they] have had a chance to review the circumstances of Dollar Dry Dock." The letter also noted that there were over 250 additional receiverships that the FDIC was evaluating to determine if there were valid goodwill claims. Pl.'s Mot. to Suppl. R. at Ex. 3.

**20.** *See. e.g., Suess*, 33 Fed.Cl. at 93. "Thus, the shareholders assert a right held not by themselves, but by the corporation—a right that the latter is either unwilling or, as in the instant case, unable to assert on its own. In this case, where the government has taken over and dissolved the corporation, this need for the derivative suit is particularly apparent and perhaps even poignant."

holder, depositor, officer, or director of such institution with respect to the institution and the assets of the institution." As the *Pareto* court observed, "[p]lainly, the section vests all rights and powers of a stockholder of the bank to bring a derivative action in the FDIC." *Pareto,* 139 F.3d at 700. The *Pareto* court goes on to conclude that "Congress has transferred everything it could to the FDIC, and that includes a stockholder's right, power, or privilege to demand corporate action or to sue directors or others when action is not forthcoming." *Id.* Therefore, the court found that the shareholders had no standing or jurisdiction to bring a shareholder derivative action in the district court.

In an area of conflicting authority, this Court agrees with the *Pareto* view. To the extent that other courts arrived at different conclusions, they did so on the basis that the shareholders had a vested interest in the residual funds or that the FDIC had a conflict of interest.

i. Shareholders Have a Vested Interest in the Residual Funds

It has been alleged that shareholders should have the right to sue derivatively in this Court when the corporation is in receivership, because any surplus will be distributed to the shareholders, and, thus, they have a vested right in this surplus. Derivative claims are apparently being allowed to proceed in liquidation situations in the consolidated *Winstar* proceedings. Transcript of Proceedings, *Winstar Corp. et al. v. United States,* Nos. 90–8C et al., at 208–10 (Fed.Cl. Jan. 30, 1997); [21] *see also Branch v. FDIC,* 825 F.Supp. 384, 405–06 (D.Mass.1993) (finding that the fact that a surplus will be distributed to shareholders means that section 1821(d)(2)(A)(i) does not vest all powers in the FDIC). However, the fact that a surplus may exist does not give this Court the right to interfere with the FDIC in its role as receiver. As the court in *Pareto* noted,

The mere fact that any residue will go to the stockholders is not surprising. Indeed, where else would it go after all de-

positors, creditors, other claimants, and administrative expenses had been paid? One would hardly expect Congress to order an escheat. * * * [Stockholders] like all others who have some interest in recovering funds from the closed bank, must simply rely upon the FDIC to do its job.
*Pareto,* 139 F.3d at 701.

The *Branch* court was unwilling to find that all of the shareholders' rights went to the FDIC, because they still had a right to any surplus under section 1821(d)(11)(B). In language relied on by the *Suess* court, the *Branch* court held:

In light of the language and juxtaposition of these two sections, this Court cannot conclude that Congress intended to preserve shareholders' rights to the residual assets of the failed financial institution, yet terminate the shareholders' ability to protect the failed institution's interests. * * * In the absence of legislative history supporting such a decisive derogation of shareholders' common law rights, the Court cannot interpret section 1821(d)(2)(A)(i) to divest failed institutions' shareholders of their rights to assert a derivative action on behalf of the failed institution.
*Branch,* 825 F.Supp. at 404–05. The legislative history does not provide explicit recognition of the fact that Congress intended to transfer the shareholders' right to bring a derivative action; however, there is a clear intent to grant expanded receivership powers to the FDIC.

Prior to the passage of FIRREA,[22] section 1821(d) provided that the FDIC as receiver "shall have all the rights, powers, and privileges now possessed by or hereafter granted by law to a receiver of a national bank * * *." 12 U.S.C. § 1821(d) (1988). FIRREA expanded the FDIC's powers in a "comprehensive amendment * * * designed to give the FDIC as conservator or receiver power to take all actions necessary to resolve the problems posed by a financial institution in default." H.R.Rep. No. 101–54, pt. 1, at

21. Judge Turner issued a "tentative" bench ruling at the hearing, which may be superceded by a forthcoming written opinion.

22. Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub.L. No. 101–73, 103 Stat. 183 (1989).

615

415 (1989). Congress obviously intended an expansive grant of power to the FDIC so that the agency could resolve the savings and loan crisis at the lowest possible cost to the taxpayers. Entangling the FDIC in derivative actions conflicts with the streamlined procedures Congress created to resolve problems in the banking system.

Similar to the comprehensive system described in *United States v. Fausto*, 484 U.S. 439, 108 S.Ct. 668, 98 L.Ed.2d 830 (1988), the FIRREA also has created a comprehensive system designed to resolve the powers of the FDIC as receiver. In *Fausto*, the Supreme Court held that the Civil Service Reform Act of 1978, Pub.L. No. 95–454, 92 Stat. 1111 *et seq.* (codified, as amended, in various sections of title 5 of the United States Code) ("CSRA"), divested this Court of jurisdiction to hear personnel actions arising under the Back Pay Act, 5 U.S.C. § 5596 *et seq.* (1994). *Fausto*, 484 U.S. at 453–54, 108 S.Ct. 668. In so holding, the Supreme Court emphasized that "the CSRA 'comprehensively overhauled the civil service system,' creating an elaborate 'new framework for evaluating adverse personnel actions against [federal employees]' * * *." *Id.* at 443, 108 S.Ct. 668 (quoting *Lindahl v. OPM*, 470 U.S. 768, 773–74, 105 S.Ct. 1620, 84 L.Ed.2d 674 (1985)). More specifically, the Court in *Fausto* concluded that:

> under the comprehensive and integrated review scheme of the CSRA, the Claims Court (and any other court relying on Tucker Act jurisdiction) is not an "appropriate authority" to review an agency's personnel determination. * * * Now, as previously, if an employee is found by an "appropriate authority" to have undergone an unwarranted personnel action a suit for backpay will lie. Post–CSRA, such an authority would include the agency itself, or the MSPB or the Federal Circuit where those entities have the authority to review the agency's determination.

*Id.* at 454, 108 S.Ct. 668. Here, the FDIC has the authority to determine what actions to bring on behalf of the shareholders. Thus, under the comprehensive statutory scheme, there is no right for the plaintiff to exercise. The FDIC has not, as of yet, decided to act on First Hartford's demands. *See supra* note 19. This Court, however, is not the appropriate authority to review those decisions, in view of the foregoing discussion.

ii. FDIC's Perceived Conflict of Interest

Several cases also have allowed derivative claims to go forward due to a "perceived" conflict of interest within the FDIC.[23] The FDIC in its role as receiver would be suing the FDIC in its corporate role. Since the FDIC would be suing itself, arguably it would fail to take into consideration the protection of shareholders' rights. "It is a little like the fox arguing that it is in a better position to know the chickens' interests than the chickens." *Suess*, 33 Fed.Cl. at 97. The *Suess* opinion goes on to state that the idea that the receiver for the failed depository institution[24] "will adequately protect the rights of shareholders by suing itself is nothing more than a rhetorical sleight of hand and is of little comfort to former shareholders who suddenly lose not only their rights and interests in a failed institution but also the right to litigate those rights." *Id.; see also* Transcript of Proceedings, *Winstar Corp. et al. v. United States*, Nos. 90–8C et al., at 210–11 (Fed.Cl. Jan. 30, 1997).

Such skepticism may have been warranted at the time that *Suess* was decided; however, the FDIC has since demonstrated its independence as a receiver. Perhaps the FDIC as receiver would not have brought goodwill claims against the Government except for the path-breaking work of the original *Winstar* plaintiffs. However, after the validity of the goodwill claims was established, the FDIC, as receiver, has *acted* to protect the rights of the failed depository institutions.

The FDIC, as receiver, is subject "to the powers conferred and the duties related to the exercise of such powers imposed by State law" on the receiver of an insured depository

---

**23.** *See Suess*, 33 Fed. Cl. at 97; *see also* Transcript of Proceedings, *Winstar Corp. et al. v. United States*, Nos. 90–8C et al., at 210–11 (Fed. Cl. Jan. 30, 1997).

**24.** The *Suess* case involved a failed thrift, thus, under FIRREA, the Resolution Trust Corporation acted as receiver, rather than the FDIC as in the present case.

institution under section 1821(c)(3)(B). Thus, in the present case, the FDIC is subject to the duties imposed upon receivers by New York state law. In addition, the FDIC, as receiver, is not "subject to the direction or supervision of any other agency or department of the United States or any State in the exercise of its rights, powers, and privileges." 12 U.S.C. § 1821(c)(3)(C). The FDIC has intervened in more than 40 *Winstar*-related cases, as receiver, and has originated similar claims against the Government on behalf of failed depository institutions in receivership. (Def's. Suppl. Reply Br. Pursuant to Order of Aug. 14, 1997, at 5). This Court concludes that the FDIC, in its capacity as receiver for Dollar Dry Dock, is the proper party to bring suit. It is not this Court's jurisdictional role to second guess the FDIC's failure to bring suit (at least to this point) on behalf of Dollar Dry Dock. First Hartford has not alleged any breach of fiduciary duty on the part of the FDIC. Even if they had, it appears clear that the remedy for such breach is not a shareholders derivative suit in this Court, but rather an appropriate action against the FDIC in the appropriate federal district court. The FDIC's role as receiver was created by Congress and it is not this Court's role to disturb or question that system.[25]

In summary, First Hartford is unable to establish a right to bring a shareholder derivative claim in this Court. Such a claim is not provided for in the Rules of the Court of Federal Claims, and is not allowed under binding Court precedent. This Court is not persuaded by the *Suess* line of cases and the creation of a derivative right of action by analogy to the *Quinault* decision. Even if a derivative right of action existed in this Court, First Hartford's claims would still fail because it does not follow the formalities of

bringing a derivative suit, as outlined in FRCP 23.1 and has not considered the FDIC's role as receiver, as outlined in the FIRREA—a comprehensive statute which dramatically changed the banking industry. Therefore, this Court dismisses those counts in the Complaint to the extent that First Hartford seeks recovery for breach of contract by way of a shareholder derivative action on behalf of Dollar Dry Dock.

## II. Rescission

Count V for rescission of the shareholders' respective investments in Dollar Dry Dock is also dismissed for lack of jurisdiction, because this Court has already held that the plaintiff is unable to sue on its own behalf, on behalf of a class of putative shareholders, or derivatively on behalf of Dollar Dry Dock.[26] Rescission is the power of contract avoidance that a party may exercise when fraud or mutual mistake exists. *See, e.g., Nebco v. United States*, 23 Cl.Ct. 635, 642 (1991). The remedy of rescission allows a party to seek disaffirmance of a contract and the return to the status quo that existed before the transaction was executed. *See Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank*, 850 F.Supp. 1199, 1212 (S.D.N.Y.1994), *aff'd*, 57 F.3d 146 (2d Cir.1995).[27] Rescission allows a shareholder to tender its shares to the institution in return for its original purchase price regardless of the present net asset value of such shares. However, absent a rescission agreement, mutual mistake, or fraud, a shareholder may not seek to tender its shares to the original institution or its receiver—the FDIC in the present case. Furthermore, if fraud is alleged in the sale of

---

**25.** In the larger scheme of banking regulation, this potential conflict is just one of many. For example, when a depository institution fails, the FDIC as receiver sells assets to the FDIC corporate side. 12 U.S.C. § 1823(d) (1994).

**26.** A "rescission" amounts to the unmaking of a contract or an undoing of it from the beginning and not merely a termination of the contract. It may be effected by mutual agreement of the parties or by one of the parties declaring rescission of contract without consent of the other, if a legally sufficient ground thereof exists or by applying to the courts for a decree of rescission. *See Black's Law Dictionary* 1306 (6th ed.1990).

**27.** Because there is little controlling federal common law on rescission, this Court will take into account the "best in modern decision and discussion," including the laws of the State of New York. *See Prudential Ins. Co. v. United States*, 801 F.2d 1295, 1298 (Fed.Cir.1986), *cert. denied*, 479 U.S. 1086, 107 S.Ct. 1289, 94 L.Ed.2d 146 (1987); Amended Assistance Agreement at ¶ 10.4.

the shares, the plaintiff must plead fraud with particularity. *See* RCFC 9(b).[28]

The plaintiff failed to plead that mutual mistake or fraud caused its reliance and subsequent injury. *See Degenaars v. United States,* 2 Cl.Ct. 482, 489 (1983). Even if this Court could find that the plaintiff pleaded fraud in the inducement of its investment in Dollar Dry Dock, First Hartford still did not plead the fraud with particularity. *See* RCFC 9(b). The plaintiff has shown this Court no support for any instances of fraud. *See G & H Tech., Inc. v. United States,* 8 Cl.Ct. 572, 574 (1985). Specifically, the plaintiff makes no references to the time, place, and manner of any false representations. *See Tyger Constr. Co. v. United States,* 28 Fed.Cl. 35, 53 (1993). To the contrary, the plaintiff merely alleges that it relied on representations that the FDIC and Dollar Dry Dock contractually agreed to treat supervisory goodwill as a capital asset. These general allegations are not sufficient to state a claim for rescission based on mutual mistake of fact or fraud. Also, the plaintiff did not allege sufficient information, such as the identity of individuals and documents, that would have permitted the defendant to respond to the plaintiff's allegations of fraud. *See BMY–Combat Sys. Div. of Harsco Corp. v. United States,* 26 Cl.Ct. 846, 850 (1992).

Therefore, the plaintiff has failed to state a valid claim for rescission and Count V of the Complaint is dismissed to the extent that the plaintiff seeks rescission of the investments in Dollar Dry Dock on behalf of itself, on behalf of a putative class of shareholders, or derivatively on behalf of Dollar Dry Dock.

### III. Takings Claims

With regard to Counts III and IV, which allege actions for takings under the Fifth Amendment, the defendant contends that those claims should also be dismissed because First Hartford and the other shareholders cannot demonstrate any interest in the property taken. The defendant also contends that the alleged property rights and investment-backed expectations asserted in the takings claims are essentially the same as the breach of contract claims alleged in Counts I and II. The defendant further states that the plaintiff's takings claims fail to state claims upon which relief can be granted and should, therefore, be dismissed for the same reason as the contract claims, because Article 8 of the Amended Assistance Agreement permitted the FDIC to increase the required capital ratio. In addition, the defendant contends that the plaintiff is prohibited from claiming the breach of contract and takings claims together. In its opposition to the defendant's Motion to Dismiss, the plaintiff argues that it adequately alleged a taking, because Article 8 of the Amended Assistance Agreement did not permit the FDIC to deny Dollar Dry Dock the benefit of its supervisory goodwill.

When the Government takes an individual's private property for public use, the Fifth Amendment ensures that the individual receives just compensation. U.S. Const. amend. V. In every taking claim under the Fifth Amendment, a plaintiff must initially show standing, including proof of personal injury, the requisite interest in the property at issue, and the deprivation of that property by the United States. *See Maniere,* 31 Fed.Cl. at 420; *Shanghai Power Co. v. United States,* 4 Cl.Ct. 237, 239–40 (1983), *aff'd* 765 F.2d 159 (Fed.Cir.), *cert. denied,* 474 U.S. 909, 106 S.Ct. 279, 88 L.Ed.2d 243 (1985). The requisite interest in the property is ownership at the time of the alleged taking by the Government. *See Applegate v. United States,* 35 Fed.Cl. 406, 420 (1996); *Maniere,* 31 Fed.Cl. at 420–21 (finding that the plaintiff owned no shares of stock on the date of the taking, and, therefore, the plaintiff did not possess standing to sue). Furthermore, a property interest is grounded in a legally enforceable right—not in an expectancy. *See Applegate,* 35 Fed.Cl. at 420 (citing *United States v. Petty Motor Co.,* 327 U.S. 372, 380 n. 9, 66 S.Ct. 596, 90 L.Ed. 729 (1946)).

---

**28.** RCFC 9(b) states: "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally."

■ In this case, the plaintiff fails to identify an ownership interest taken by the FDIC. The plaintiff and other shareholders owned stock in Dollar Dry Dock during the time periods relevant to this action, but that stock is not the property allegedly taken. *Cf. American Continental Corp. v. United States*, 22 Cl.Ct. 692, 694–95 (1991) (rejecting shareholders' takings claims involving a failed savings and loan). To the contrary, in its Complaint, the plaintiff alleges that "Dollar Dry Dock's contractual right to treat goodwill as an intangible asset for regulatory capital purposes is a property right protected by the Fifth Amendment." (Compl. at 14.) Therefore, according to the plaintiff, "[t]he FDIC's decision in December 1990 to effectively discount or otherwise exclude Dollar Dry Dock's goodwill as a regulatory capital asset constituted a repudiation of the FDIC's contractual obligations and a taking in violation of the Fifth Amendment." (*Id.*) Thus, again, the plaintiff's takings claims revolve around the Government's alleged breach of its Amended Assistance Agreement to Dollar Dry Dock. If there is a contract right that can be taken, that right is the property of Dollar Dry Dock. Thus, First Hartford is again suing derivatively, seeking to enforce the contract rights of the corporation. As

was explained above, this Court does not have jurisdiction to consider derivative actions. First Hartford's claims do not allege the taking of the plaintiff's stock or dividends.[29] The takings claims, therefore, are nothing more than the plaintiff's breach of contract claims as stated in Counts I and II, and this Court has already determined that First Hartford had no direct third-party or derivative interest in the contractual provisions of the Amended Assistance Agreement or the MOU. To the extent that First Hartford is alleging a taking due to a decline in the price of Dollar Dry Dock's stock, they still fail to establish standing because Dollar Dry Dock, as a corporation, is a distinct legal entity and is capable of asserting its rights either directly or through its receiver, the FDIC. Therefore, First Hartford cannot assert a takings claim, "based upon the legal rights or interests of these third parties." *McKinney v. United States Dept. of Treasury*, 799 F.2d 1544, 1555 (Fed.Cir.1986). As a result, the plaintiff cannot establish jurisdiction nor standing to assert that the FDIC's changed position on the treatment of goodwill, which allegedly breached the Amended Assistance Agreement, constituted a taking of Dollar Dry Dock's property.[30]

---

**29.** Even if the plaintiff shareholders in this suit had alleged a Fifth Amendment taking of their stock, dividends, or investment-backed expectations, recovery for such allegations would be difficult. First, the disputes in this case arose from the Government's attempts to shore up and overhaul the troubled savings and loan industry. The federally-insured banking industry is also one of the most regulated and closely supervised industries. *See, e.g., Fahey v. Mallonee*, 332 U.S. 245, 250, 67 S.Ct. 1552, 91 L.Ed. 2030 (1947); *see also American Continental Corp.*, 22 Cl.Ct. at 695–97. This extensive regulation is designed to promote public interests and the common need for a sound banking system. As such, "[c]ourts have been hesitant to find a fifth amendment taking where * * * the government's alleged interference with property 'arises from a public program that adjusts the benefits and burdens of economic life to promote the common good.'" *American Continental Corp.*, 22 Cl.Ct. at 696–97 (quoting *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 225, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986)).

In this case, the intent of First Hartford, as a shareholder, is to secure or recover its investment in Dollar Dry Dock, even though the Complaint is couched as a shareholder derivative suit for the benefit of Dollar Dry Dock. However,

"when an investment is made in such a highly regulated industry, to be reasonable, expectations must be based not only on then-existing federal regulations but also on the recognition that there may well be related changes in the regulations in the future." *American Continental Corp.*, 22 Cl.Ct. at 697; *see also Connolly*, 475 U.S. at 227, 106 S.Ct. 1018; *Atlas Corp. v. United States*, 895 F.2d 745, 758 (Fed.Cir.), *cert. denied*, 498 U.S. 811, 111 S.Ct. 46, 112 L.Ed.2d 22 (1990). Moreover, the FDIC, as Dollar Dry Dock's appointed receiver is the proper party to bring takings claims and at present the FDIC is undecided on whether to intervene at all on behalf of Dollar Dry Dock.

**30.** The plaintiff also claims that "[t]he FDIC's direction or recommendation that the Superintendent seize Dollar Dry Dock also constituted a repudiation of the FDIC's contractual obligations and a taking in violation of the Fifth Amendment." (Compl. at 14–15.) Even if First Hartford could establish standing to sue on a takings theory, the seizure of Dollar Dry Dock and appointment of the FDIC as receiver did not constitute a taking. *See American Continental Corp. v. United States*, 22 Cl.Ct. at 696–701 (1991).

The power to exclude parties, such as the Government, is an essential element of property own-

Counts III and IV of the Complaint are, therefore, dismissed to the extent that they seek just compensation under the Fifth Amendment on behalf of First Hartford or the class of shareholders.[31]

In summary, First Hartford has failed to establish that the Court of Federal Claims has jurisdiction to hear its contract claims. Since First Hartford is not in privity of contract with the Government, it cannot establish individual jurisdiction. The contract between Dollar Dry Dock and the FDIC explicitly disclaims any intent to benefit third parties, so First Hartford cannot establish jurisdiction based on a third-party beneficiary status. First Hartford's shareholder derivative claims also fail to establish jurisdiction. The Rules of the Court of Federal Claims do not provide for shareholder derivative actions. In addition, the binding precedent of the *Whited* cases prevents this Court from finding jurisdiction. This Court is not persuaded by the *Suess* line of cases and instead chooses to follow the logic of the Court of Appeals for the Ninth Circuit in the *Pareto* case. Likewise, the plaintiff's argument that they should be treated as a surety is without merit. In addition to legal precedent, this Court is also persuaded that there are sound policy reasons that counsel against creating a derivative right of action in the United States Court of Federal Claims.

Having failed to establish jurisdiction for their contract claims, First Hartford's claim for rescission also must fail. In addition, the plaintiff failed to properly state a claim for rescission. Finally, the plaintiff's takings claims in the alternative also fail because First Hartford cannot establish jurisdiction or standing.

## CONCLUSION

For all of the foregoing reasons, this Court grants the defendant's Motion to Dismiss all six counts of the plaintiff's Complaint. The Clerk of the Court is directed to enter judgment accordingly.

Each party is to bear its own costs.

---

ership. *See California Hous.*, 959 F.2d at 958. First Hartford, individually as a stockholder in Dollar Dry Dock, could not have excluded or prevented the Superintendent from seizing the bank or the FDIC from becoming the bank's receiver. Furthermore, even if this Court had jurisdiction to decide the plaintiff's derivative suit on behalf of the bank, Dollar Dry Dock does not possess a valid taking claim because the seizure of Dollar Dry Dock was fully within the Government's contractual rights. (*See* Amended Assistance Agreement art. 8 at 25); MOU ¶ 16 at B–10. In addition, the plaintiff and the class of Dollar Dry Dock's shareholders do not have an "historically rooted expectation of compensation" that is required to establish a Fifth Amend-

ment taking because of the extensive regulatory scheme of the banking industry. *See Golden Pac. Bancorp v. United States*, 25 Cl.Ct. 768, 770 (1992) (quoting *California Hous.*, 959 F.2d at 958), *aff'd*, 15 F.3d 1066 (Fed.Cir.), *cert. denied*, 513 U.S. 961, 115 S.Ct. 420, 130 L.Ed.2d 335 (1994); *American Continental Corp. v. United States*, 22 Cl.Ct. at 696–99.

31. In view of the dismissal of all of First Hartford's claims, the outstanding motion for certification of the class action is dismissed as moot.

